62386 United States v. Rodney Russell and number 162392 United States v. Malcolm A. French Good morning. May it please the court and counsel. My name is Jamesa Drake. I represent Malcolm French and I would ask this court for a minute and a half for rebuttal time. My predecessor, Judge Salyer, instructed me that you can only have one minute, twenty-eight seconds. And that is what I shall have. Thank you, Your Honor. Defendant made a colorable showing that Juror 86 failed to answer honestly material voir dire questions. That was enough to trigger an evidentiary, rather, that was enough to trigger the court's duty to investigate. The court reviewed the record and the pleadings submitted by the parties. But these documents never could have answered the questions that animate the McDonough test. What was the juror's motivation for responding in the manner that she did? And could those reasons affect her partiality? Let me be clear, Ms. Drake. What we're asking for on this claim of error is a remand for an evidentiary hearing, not a vacation of the conviction. On this ground. On this ground, we are asking for a vacation of the conviction and a new trial. How do we get a vacation of the conviction? If it's improper for the judge to determine motive without an evidentiary hearing, how can we determine the absence of motive without an evidentiary hearing? What this court can conclude is that too much time has passed, such that an evidentiary hearing in this case would be futile. In Sampson, the court remanded for an evidentiary hearing. Yes, that's right. And did we say, and there are cases out there where so much time will have passed that we'll skip the evidentiary hearing and just vacate the conviction? No. Do you have any case that says that in this posture of the record, an appellate court should vacate the conviction? The closest we have of a discussion on this point is the failure case from last year. That doesn't hold anything like what I've just asked you. I asked you if you have any case that held that an appellate court should vacate a conviction because a trial judge should have held an evidentiary hearing and should vacate the conviction rather than simply direct the trial judge to hold the evidentiary hearing. No, Your Honor. You also want to be careful here because I think the premise of asking for a new trial is that too much time has passed for the person to remember. That premise is a very dangerous premise for you because that's the premise that the district court relied upon, not to have any further investigation. If we were to conclude that the person's passage of time means that an investigation would be untruthful, then you've got a problem. Doesn't it make much more sense for the court to call in juror number 86 and go over why it was that she answered the questions the way that she did and then with a full record that he'll be able to ask some questions on, make a determination at that time as to her memory and her reasons Yes, certainly that's possible and if that were the remedy that this court were to effectuate, we would be satisfied with that. As I was starting to say, the Feria court, I think, addressed this issue about the parties in that case that alleged, as we do, that too much time had passed. And from what I can tell, there were, I'm sorry, the Zuni case, from what I can tell, there was about two years between the time of the verdict and the time of the remand in this case. And this court said what Your Honor is saying, which is we'll go back for an evidentiary hearing. And if at that point it becomes clear that either the juror cannot be located or memories are faulty, at that point the district court can decide what to do next. And certainly that is an option for this court here. But that doesn't mean vacate. It just means decide what to do next. That's correct. In that case, it would be remand for an evidentiary hearing, at which point the district court can decide which steps to take. Of course, all of this points towards our primary contention, which is that the trial court in this case did not conduct an adequate investigation. Because on this record, we don't have answers to the salient questions that McDonough suggests we should. What's the effect of the fact that counsel for your client never objected to the fact that the juror had neither completed the juror questionnaire nor even signed it? Is there some sort of waiver entailed in that? No, Your Honor. At this stage, on direct appeal, as opposed to, of course, a habeas petition where a claim of ineffective assistance of counsel might be raised, that should not factor in the analysis. Why? What's your authority for that? Well, defense counsel in this case, unlike in some other cases that this court has considered, had no reason to know and did not know about Juror 86's signing. No, but counsel did know or should have known that the juror had not followed the court's instructions, had not completed the juror questionnaire, and had not signed it. Those would have picked up on that. Counsel didn't call out to the court's attention. So why isn't that a waiver of any difficulty with the questionnaire? I realize that there's something involved here beyond the questionnaire. I'm trying to take this in order. I have two responses to that. The first is that in a perfect world, perhaps the defense team should have asked questions. However, and this is my second part. In a rational world? Well, Your Honor, I would say that, I would suggest that it's not an uncommon occurrence for jurors in any case to not fully complete the juror questionnaire. Not to sign the questionnaire? Yes, Your Honor. Do you have any other case where that's true? Not at most. Do you have any case where we have an appeal that Bob the juror didn't sign the juror questionnaire? If I may answer, I don't have a case. But anecdotally, I can with confidence represent to this court that that happens often. And were this court to require attorneys to go on a fishing expedition and ask jurors to explain non-answers or their failure to sign every questionnaire, it would materially change and lengthen the voir dire process. Thank you. Wait a minute. Wait a minute. You had a second point to make that I'm interested in hearing. The second point is that we don't exactly have a completely blank juror questionnaire. We have the response NA to question 3A. And there was no reason for defense counsel not to accept that at face value. If having accepted the juror's seeming representation that she did not have a family member with involvement in controlled substances or court matters involving controlled substances, there really would have been no other reason for the defense team to probe further during the selection process. All right. We're all set. Thank you. May it please the court, my name is William Maddox. I represent defendant Rodney Russell on this appeal. His wife and friends are in the courtroom. Good morning. Good morning. I do believe that the case should be remanded for the reasons in that abacature given the prior questions. It does seem that in the Sampson case there was a great deal of time delay in that particular case, which is even longer than this case. And also the Okiyama case, I think, addresses some of those concerns and there may be other cases in my brief about not answering the proper questions. And I believe that it's also the court's responsibility to make sure that all the questionnaires are properly filled out. And I do know in this case... I'm not talking about the court, the questionnaire being filled out. The thing that bothers me about the questionnaire is that it wasn't signed. And you're suggesting that counsel have no responsibility? No, Your Honor. I think counsel does have responsibility. And I do think... I do know that the juror list in this case was not finalized until the Tuesday before the Wednesday of the trial beginning. And so I don't know which juror questionnaires were properly vetted or not. But I do think that the court has a responsibility to properly vet the forms before defense counsel peruses them. And I do think defense counsel should review them. But then to impute a level of knowledge to counsel, given the vast quantity of information that defense counsel has to undergo and go through to prepare for trial... I don't understand what you mean by impute a level of knowledge. It doesn't take any level of knowledge to look at a questionnaire and see that it's unsigned. Yes, but it does take a level of knowledge to know that this particular juror questionnaire of all the juror questionnaires, of all the other information that defense counsel has to go through, was going to be the one where the juror had a son who was convicted of marijuana. How many jurors were in the pool? I think there were... I don't know the exact answer. Apperly may have that answer. But I think there was over a hundred. I would say also in... You've tried lots of different cases. Yes, Your Honor. Counsel, when they're absorbing those forms, counsel's post to the court doesn't really pay attention to whether they're signed or not. That's not what you're looking for in the forms. You're just assuming they're signed and you look for the information that will tell you which jurors you might want to move to start thinking which jurors you might want on the panel. In all probability, Your Honor, that's correct. It was not my particular responsibility in this particular case to go through the juror questionnaires, but yes, I would agree with that. But I don't think that that obviates the principle that the court does have some of the authority to do that. I would also say that I do think that with respect to this particular issue, I think that I believe it was Justice Tortorella in the second case had said that this arcane corner of the law is particularly muddled, and I think that's true. I think that those two opinions upon which the district court relied, Sampson and McDonough, were both decided after evidentiary hearings, and after those evidentiary hearings induced evidence upon which to decide the issue. In this case, we didn't have that. We had a colorable claim, and I believe that Mr. French's counsel may have distracted the court by presenting a series of facts that maybe some may consider far-fetched or just too specific that went beyond the colorable claim, and to therefore interview in the third issue, the issue that is the colorable claim in that particular case, in that particular juror, it seems to me that an evidentiary hearing was not properly devised in order to ascertain the truth as to whether the witness versus the jury member could describe the jury foreman's level of knowledge of the witness. If you now switch from the juror we were discussing to another one of your juror disqualifications? Yes, Your Honor. Is this the juror who may or may not have worked with someone connected to the case? Yes, Your Honor. Yes. That's my third issue. But on that issue, the district judge did grant an evidentiary hearing and ruled after the hearing, right? He granted an evidentiary hearing but of the witness and not of the jury foreman. And I just think that that procedure was not guaranteed to ascertain the truth of the jury foreman's level of knowledge. If the procedure were to gain the witness's knowledge, then that's the procedure to follow. But it's not the procedure to follow if the jury foreman's level of knowledge. So it just was an indirect way to find direction out in that particular case. Thank you. Good morning. May it please the court, Rene Bunker on behalf of the United States. I too will start with the juror 86 issue and point out the appellants are asking the court to vacate their conviction so that they could conduct a peremptory challenge and a voir dire that they had every opportunity to conduct in January of 2014. How did they have every opportunity? She was asked a point blank question whether any family member had any court matter of any type. And if so, describe certain information and she puts N.A. And the district court found that was a wrong answer. Why would they have asked about that question? Because first of all, the questionnaire was and four of the six questions on page one were N.A. answers. I'm sorry. The entire page two was blank and it was not signed. So any one of those five defense attorneys could have asked the magistrate who was liberally hauling jurors up to follow up on questions by counsel to inquire about those N.A. questions. Judge Woodcock found that it was a mistake. N.A. is a very common thing. Particularly where this question was structured where it said tell us about each of the court matters, she writes N.A. And as for not being signed, are you advocating that we have a rule that if counsel doesn't know that a juror questionnaire is not signed, then you waive any ability to subsequently object to a flat-out false answer by a witness? No, Judge, I don't think there are any blanket rules in this context, period, including whether or not the judge has abused its discretion in hauling a juror post-verdict for further questioning, but that five defense attorneys had or should have reviewed that very sparse questionnaire and five defense attorneys chose not to ask any follow-up questions that might have. Look at Juror 10. Juror 10, the government followed up on Juror 10's questionnaire because Juror 10's son also had marijuana possession convictions. That's what the voir dire is for. It's for the side of the questionnaire. Just to hone in on Judge Kaye at this point, most people think N.A. means non-applicable. So that once you answer non-applicable, that has a specific meaning that is not applicable, meaning she doesn't have any or anybody in her family have any connection to drugs. So even if she answered N.A. to everything on that page, that in and of itself would simply have meant all of those questions were not applicable to that juror. So the only thing that we're left with then is the problem of the signature at the end. I think that Judge Woodcock aptly pointed out that N.A. can mean a variety of things. It often means not applicable. He cited some other possible means, unavailable, et cetera. I think it was time ago. It was some time ago. I think the information that the judge took as true regarding the son was a 2003 marijuana conviction, possession conviction, 2004 probation violation, 21 days jail, 2004 marijuana-related offense, and a 2010 offense. So I think that... That's a goodly bit. Well, I think that Judge Wood... I think it does circle back, and I don't mean to beat a dead horse here, but to have five defense attorneys look at that questionnaire, it's in the appendix, and want no further follow-up, and then to ask now for years later. Well, of course, even beyond the questionnaire, you've got the question and the thought here. Exactly, Judge Stellier. In fact, the question at court here was, do you or any of your close family members have experiences with controlled substances, marijuana, et cetera, that would affect your ability to be impartial? And the juror there also indicated by silence that she would remain impartial. And it's impossible to tell from that silence whether by that silence she meant that she had no close family, she meant to represent, that she had no close family member who had that involvement, or that any such involvement would not affect her judgment. The question itself is poorly drafted and ambiguous. So it's impossible, it's not possible to tell from the juror's silence which of those two things she meant, is it? I think, as Judge Woodcock pointed out, the question also presumes that somebody could have a family member who had experience and found themselves... She could have meant that it wouldn't affect her judgment. Correct. How can you tell? You've got an ambiguous question where silence can mean one of two things. So how, without an evidentiary hearing, can a district judge tell which of those two things the witness meant to convey? Well, I think that that gets to the standard for having an evidentiary hearing, which, again, there's no bright line. Well, the ultimate standing is to do justice. If these defendants didn't have a fair trial because they had a biased juror, we want to get to the bottom of that. With all due respect, I don't see the case law saying that the court doesn't assume bias. Defendants have to show... I don't think they should assume bias, but I'm saying here's a question that most people would think silence meant that there was no involvement of a close family member with drugs or marijuana in the law. Most people. There is another interpretation of the question where silence would be perfectly appropriate. Again, I think the defense is asking the court to assume bias in their favor and assume prejudice. In the cases... They're not asking us to assume bias and prejudice. They're saying the witness gave a false answer to a very material question, exploration of which might well uncover a serious bias and prejudice. We don't know for sure, so the court should do an investigation. It doesn't have precedent usually say that we have that situation where there's a reasonable basis for thinking that a false answer by a juror has covered up something that would have disqualified the juror. We prefer to check that out and see if it's the case rather than just leave things standing. I think the standard is more robust than that, Judge Kayada. Reading the case law, and I came across two cases today that articulate what I think the standard is, but the case law is pretty clear that courts... One, it's very that specific contextual case by case. There's no bright line rule here. Two, every case... Not every, because the Supreme Court and this court's circuit precedent makes clear that courts should be very cautious to haul jurors in here two years later to do this post-verdict interrogation. Three, the test is that in order to get a hearing like that, the appellants would have to show a sufficiently colorable claim, meaning substantial evidence of juror misconduct or taint. Let's take... May I just add... Don't we have substantial cases here? No, I don't think so. Because we now know, in fact, from the background from the court, that that answer was false and that the true answer was that her son was a drug addict who had actually got to the point of being incarcerated and she's going to hear a trial against alleged drug dealers, growers, distributors. So she may be, you know, have an agenda one way or the other here. May I finish the test quickly? Conley is a 2003 case, 2009 biller, that says to haul the juror in, quote, a court should only conduct such an inquiry when reasonable grounds for investigation exist, i.e. there is clear, strong, substantial, and incontrovertible evidence that a specific non-speculative impropriety has occurred, which could have prejudiced the trial defendant. And it's a high standard the court added. This isn't sort of an ethereal or amorphous question. And so even with the prejudice that delay can sometimes cause, she knows that her son had these convictions, or maybe she didn't at the time, although if she was visiting him in jail, I'm not sure how she can deny it. So it's not like the passage of time is going to result in a problematic hearing upon remand if that's what we decide to do, so that counsel can explore why she answered the question the way she did. Well, I think many courts are concerned about the passage of time in terms of even we've had a marijuana referendum in Maine legalizing marijuana. And a lot of things the Supreme Court has repeatedly, and even recently, expressed that passage of time is a serious consideration in terms of how a juror is going to look back through a colored lens in terms of what experiences, how much she's talked about the case, et cetera, as to why she answered N.A. or why she answered affirmatively, indicating to the magistrate judge that she could be fair. So I do think passage of time is a concern. And then the court, Judge Woodcock did walk through the Simpson factors and found that each one, and I think supportably so, for each one the defendants didn't show he did so. He did so expressly by saying the defendant hadn't carried the burden of showing reasons about why she gave a false answer, which seems to be sort of a catch-22 almost. I'm not going to bring the person in to question her about why she did it, and then I'm going to rule against the defendant because the defendant hasn't shown why she did it. I think he found that... That's exactly what he said. I don't recall reading that, Judge. I think he initially found that they hadn't shown that she engaged in misconduct, that she basically made an honest mistake. How would they have shown that without bringing her in? Well, I think the next step was the judge walked through the Simpson factors and indicated they had to show some substantial prejudice or likelihood of substantial prejudice. That's Neron, Dahl, Aponte, Rivera, that just making the allegation and speculating about possibly she was prejudiced against the defendant is not enough under this court's precedent. So I think the judge fairly walked through those standards and held, especially when you get back to the fact that five defense attorneys were down there and had every opportunity to do this questioning, as was done at Juror 10, which would have elicited any type of bias, and here we are years later trying to give them an opportunity to do that when they bypassed it the first time around. So with that, I would ask that the court affirm on the Juror 86 issue. I can touch on the Juror, unless there are additional questions, the Juror 79 court issue, which I would emphasize first two things, I guess, three things. Looking first at how much Judge Woodcock did on the Juror 79 issue. He reviewed those voluminous pleadings, which included the defense's post-trial online research, not pre-trial, all research that could have been done pre-trial. He went and read Richard's, I mean, French's opening statements about the needle in the haystack. He read Koenig's testimony. He read the investigatory report, Agent Richards who went to interview Koenig twice about the Juror 79 allegations. He held a hearing in 2015 at which everybody got to question Koenig extensively. Judge Woodcock went back, did some more of his own research, checked the docket and said, geez, who called Koenig as a witness? Who first listed him? It was French and Russell. It's French and Russell who have the history with Mr. Koenig, and that is important here because it gets to what, again, we're circling back to defendants' quibble with blaming them or holding them accountable for what they could have or should have done, and the case law makes clear that that's appropriate. That's Neron again, that's Dahl, and I think Ponte Suarez. And here, when you look at the record, Koenig was French's and Russell's witness, and if you look at Juror 79's questionnaire, it's in our appendix, Juror 79 completed his questionnaire. He identified himself as a marine biologist, works in wildlife fisheries management, wildlife management, for the USDI at Acadia National Park. So when you look at the record as to what happens post-trial, if any of those defense attorneys, I mean Russell is the only one pressing this claim now, and French wanted to go see, jeez, is there any overlap there between our witness Koenig and 79? What they could have done is done exactly what French did in July of 2014. Look at the transcript that's in our appendix of that recorded call. When French picks up the phone from jail and he calls Koenig and he says, hey, I want to pick your brain about something, and he asks if he knows Juror 79. He uses the juror's name, and he says, you know, the guy who works in fisheries, he's a fisheries biologist. That's exactly, Koenig had been doing work on French's property since 2006. And so for the defense to make this, I want to pick your brain, well, several months after trial, and then about October of 2014, filed a motion for a new trial. Again, based on information that they had before trial, again, we submit it's, you know, warrants bringing this juror back in. Could you just clarify for me the time frame here as to when the defense, do you know how many people were in the jury pool, and when did the defendants get the information? My understanding is they got the questionnaires at least three days before trial. My understanding is three days is the norm, and they routinely come out before that. And at one point, I knew how many were in the initial pool, and 79, I think, ended up replacing someone. I have forgotten those numbers. Judge Thompson, we'd probably get them for you. I think it's somewhere in the record. And so. And just one more question. Sure. And is New Hampshire's, or I'm sorry, is it Maine? Maine. Is Maine's like Rhode Island where they select the jury, and then the trial starts days later or weeks later? They typically do that, but in this case, jury selection was January 8, 2014, and trial started the same day. Okay. So. And again, I guess it's somewhat, the case law is clear. Courts do not have to haul jurors in and hold an evident jury with a juror every time somebody makes an allegation like this. Here, the court did extensive research, even on its own, held a lengthy hearing, and I think given the very far-fetched, I think is what Judge Woodcock ably called it, speculation about 79's forfeiture theory that, you know, Jesus. Ms. Burke, I think we're good on that. Okay, thank you. Unless my colleagues have any additional questions. We ask that you reform. Thank you. Thank you, Your Honors. Just very briefly, I wanted to reiterate something that Judge Salia said, that this is not just about the questionnaire. Even if the defense team rendered deficient performance by failing to question Juror 86 about her failure to sign the questionnaire, she effectively affirmed her N.A. response in court under oath when she failed to correctly respond to any of the multiple questions that were designed to ferret out whether someone in Juror 86's situation could be ferret for impartial because of family member involvement in controlled substances. Also, we fully recognize that hauling this language, hauling a juror back into court for an evidentiary hearing, is unpleasant and that there are problems, and we don't mean to diminish or belittle that. But once a defendant has made a colorable showing under McDonough, the court has a duty to investigate. And as between the difficulty and unpleasantness of questioning a juror and a defendant's criminal conviction, there is no contest. As Judge Salia also points out, the crux of this is fairness. Was there a fair procedure? And that is really the guiding principle here. I'm sorry. One more thing. Can you pin down for me the oral questions that were presented, the two in particular that we're talking about? Was the question about your use of family members' use of drugs or involvement in drugs, was that presented to the entire pool? Yes, it was. Okay. So it was the entire pool. Okay. Thank you. Thank you. May it please the Court. In rebuttal, I would say, first of all, that Juror 10 was already at the sidebar. So it did not create any great presence of mind to then ask her a question about marijuana. She had volunteered information that she had heard accounts of the case in the media. She was called to the sidebar, and she was addressed on that issue, and then she was asked about marijuana. She was asked individually about marijuana? Yes. Yes, Juror 10 was asked individually about marijuana at sidebar by the prosecutor. But the whole pool was asked about marijuana before. I'm not sure if it was before or after. Also, I think that silence in the face of a question is often taken as acquiescence, as Judge Selle has mentioned. And I think that if she had something to offer, she would have or should have. And same with Juror 79 and the Foreman issue. The Foreman saw the trial, and the witness was within 10, 15, 20 feet of Juror 79 the whole time. And it seems to me there is a catch-22. Do they know each other enough that they should have spoken up, or do they don't know each other enough that they didn't speak up? And so I would also say that being a marine biologist, there's all sorts of marine biologists, as the New England Aquarium can attest. There was no evidence that Juror 79 had met in person this witness, and then you have the problem of the mispronunciation of the name by the magistrate judge. Which is precisely why we needed to bring Juror 79 in to be questioned, because the basis for the information you just put forth is the witness himself. And the witness's answers were muddled. He said he might have. He might have seen him before this time or that time. He might have been to get this piece of equipment. He might have spoken with him on the phone. He was aware of him. He did contact him afterwards, after the trial, to help with the salmon restoration project issue. And so I think there was an affirmative obligation. And I think that what really should have happened is that a question should have been posed to the jury panel before or during the trial, if at any time it refreshes your recollection that you do know a juror. You should speak up. Unless it's such an instruction and you didn't ask for it. That's right. Thank you, Counselor. Thank you.